# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Four Thousand Eight Hundred Fifty Dollars ($4,850) United States Currency,**
**2011 IL App (4th) 100528**

---

Appellate Court
Caption

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant,
v. FOUR THOUSAND EIGHT HUNDRED FIFTY DOLLARS
($4,850) UNITED STATES CURRENCY, Defendant-Appellee.

District & No.

Fourth District
Docket No. 4–10–0528

Argued
Filed

May 10, 2011
July 25, 2011

Held

(*Note: This syllabus
constitutes no part of the
opinion of the court but
has been prepared by the
Reporter of Decisions for
the convenience of the
reader.*)

The forfeiture of $4,850 seized on the ground that it was connected to
illegal narcotics was barred on the ground that the State exceeded the
mandatory and cumulative 97-day deadline in sections 5 and 6(A) of the
Drug Asset Forfeiture Procedure Act, which is intended to promote
efficiency and dispatch in governmental operations and protect a
property owner's right to reasonably prompt postdeprivation
procedures.

Decision Under
Review

Appeal from the Circuit Court of Macon County, No. 07–MR–530; the
Hon. Lisa Holder White, Judge, presiding.

Judgment

Affirmed.

| Counsel on Appeal | Jack Ahola, State's Attorney, of Decatur (Patrick Delfino, Robert J. Biderman, and Charles F. Mansfield, Assistant State's Attorneys, of counsel), for the People. |
|---|---|
| | Sara M. Mayo, of LaBarre, Young & Behnke, of Springfield, for appellee. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Steigmann and Pope concurred in the judgment and opinion. |

**OPINION**

¶ 1    The police seized $4,850 in cash from the residence of Deeandre Woodland on the ground that the money was connected to illegal narcotics. The State thereafter brought an action pursuant to the Drug Asset Forfeiture Procedure Act (Act) (725 ILCS 150/1 through 14 (West 2006)), seeking a judgment that the currency should be forfeited to the State. Woodland filed a motion to dismiss the forfeiture action because the State had exceeded the cumulative 97-day deadline in sections 5 and 6(A) of the Act (725 ILCS 150/5, 6(A) (West 2006)). The trial court granted his motion, and the State appeals. We agree with the trial court that the cumulative 97-day deadline created by sections 5 and 6(A) is mandatory, not directory, and that missing the deadline had the consequence of barring the requested forfeiture. Therefore, we affirm the trial court's judgment.

¶ 2                              I. BACKGROUND

¶ 3    On August 30, 2007, the State's Attorney filed a notice of forfeiture with the circuit court. The notice was addressed to Woodland at 1435 North Woodford Street in Decatur and notified him that forfeiture proceedings were pending against $4,850 in United States currency, which the police seized on April 18, 2007, at 227 North 25th Street. The notice referred to Woodland as an owner of this currency and warned him that he might forfeit his ownership unless, within 45 days, he filed two documents with the State's Attorney's office: (1) a verified claim for the return of the currency, setting forth his interest in the currency and why that interest was not subject to forfeiture; and (2) a cost bond or, alternatively, an indigency affidavit.

¶ 4    On October 11, 2007, Woodland filed two documents with the circuit court: (1) a document entitled "Verified Claim and Motion To Dismiss" and (2) an indigency affidavit. In the first document, Woodland stated he had acquired the $4,850 "as the result of the sale

-2-

of a motor vehicle, a 1997 Ford Expedition XLT, to Christy Rubi on or about April 10, 2007."

¶ 5    In addition to explaining where the currency came from and why it was not subject to forfeiture, the "Verified Claim and Motion To Dismiss" pointed out the State's noncompliance with sections 5 and 6(A) of the Act (725 ILCS 150/5, 6(A) (West 2006)). Section 5 required the police, within 52 days after seizing the currency, to notify the State's Attorney of the seizure, and section 6(A) required the State's Attorney, within 45 days after receiving the notice of seizure from the police, to cause a notice of pending forfeiture to be given to the owner of the currency. Woodland observed that under those two statutory provisions, sections 5 and 6(A), the State had, at the most, a total of 97 days after the seizure of the currency to give him notice of a pending forfeiture ($52 + 45 = 97$). He further observed that the State had missed this cumulative 97-day deadline. The police seized the currency on April 18, 2007, and 134 days later, on August 30, 2007, the State's Attorney gave Woodland notice of a pending forfeiture. Consequently, in his "Verified Claim and Motion To Dismiss," Woodland requested "[t]hat the forfeiture action herein commenced be dismissed, with prejudice," and that the $4,850 be returned to him.

¶ 6    On June 4, 2008, by docket entry, the trial court granted Woodland's motion for dismissal for the reason Woodland had urged, namely, the violation of the cumulative 97-day deadline in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2006)).

¶ 7    The State appealed, and on December 24, 2009, we dismissed the appeal for lack of subject-matter jurisdiction. *People v. One Thousand Two Hundred Forty Dollars ($1,240)*, 396 Ill. App. 3d 665, 667 (2009). We reasoned that because the State's Attorney had not yet filed a verified complaint pursuant to section 9(A) of the Act (725 ILCS 150/9(A) (West 2006)), the trial court "lacked jurisdiction over Woodland's motion to dismiss." *$1,240*, 396 Ill. App. 3d at 672. We explained that under the Act, "Woodland had to file his own verified claim with the State's Attorney for the return of the property" (he had done so) and that "the State's Attorney had then to file a verified complaint thereby commencing the judicial forfeiture proceeding. Because the latter never occurred, the court lacked jurisdiction," so we held. *Id.*

¶ 8    On March 16, 2010, the State filed a verified complaint, which alleged as follows. On November 10, 2006, the police stopped Woodland in the 300 block of East Division Street for a traffic violation. During the traffic stop, the police searched Woodland's person and found $1,240 in currency as well as a digital scale with cocaine residue on it. On April 18, 2007, the police executed a warrant to search Woodland's residence at 227 North 25th Street. Woodland was home at the time. The police found an open bag of dog food by the back door, and inside the bag, they found a total of $4,850 in currency, banded into five separate bundles. In a trash can just outside the back door, the police found two plastic-bag corners with cocaine residue inside them. While searching the residence, the police questioned Woodland, and he stated he was unemployed. The complaint alleged that the $4,850 that the police had found in the bag of dog food was subject to forfeiture because the money was connected with drug trafficking.

¶ 9    On April 7, 2010, instead of filing an answer, Woodland filed a motion to dismiss the

State's complaint, and to return the $4,850 to him, for the same reason he had stated in his previous (premature) motion for dismissal, namely, the State had waited more than 97 days after seizing the currency to give him notice of a pending forfeiture, thereby violating sections 5 and 6(A) of the Act (725 ILCS 150/5, 6(A) (West 2006)). In a docket entry on July 1, 2010, the trial court granted Woodland's motion, again for that reason.

¶ 10       This appeal followed.

¶ 11                               II. ANALYSIS

¶ 12                A. The State's Confusion of Standing With Jurisdiction

¶ 13       The State argues that section 9(E) of the Act (725 ILCS 150/9(E) (West 2008)) required Woodland to file an answer to the complaint within 45 days after service of the complaint and that because Woodland never filed an answer, he never established his standing to appear before the trial court in this *in rem* forfeiture proceeding. The State further argues that because Woodland never established his standing, he "failed to bring himself within the circuit court's jurisdiction[ ] and he failed [to] invoke its jurisdiction over the subject matter of his motion."

¶ 14       Thus, the State takes the position that because Woodland never established his standing, the trial court lacked personal jurisdiction over him and the court also lacked subject-matter jurisdiction. The State is mistaken on both points. Under Illinois law (in contrast to federal law), standing has nothing to do with subject-matter jurisdiction. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 253-54, 254 n.4 (2010). As for the asserted lack of personal jurisdiction over Woodland, *in rem* jurisdiction is an alternative to personal jurisdiction (*In re Possession & Control of the Commissioner of Banks & Real Estate of Independent Trust Corp.*, 327 Ill. App. 3d 441, 463 (2001)), and besides, Woodland submitted himself to the jurisdiction of the trial court by appearing generally and arguing that the State's complaint should be dismissed and that the currency should be returned to him (see *In re Possession*, 327 Ill. App. 3d at 464).

¶ 15                           B. The Standing of Woodland

¶ 16       The State contends that Woodland had to file an answer in order to show that he had standing, a "real interest in the outcome of the controversy." *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 328 (1997). We disagree. It already was apparent from the State's own filings that Woodland had standing.

¶ 17       In its notice of pending forfeiture, for example, the State identified Woodland as the owner of the currency. Also, the verified complaint alleged that the police found the currency inside a bag of dog food in Woodland's residence. If money is found inside a person's residence, the money presumably belongs to that person. Ownership of personal property, including money, is presumed from the possession of it (*Brownell v. Dixon*, 37 Ill. 197, 206 (1865); *People v. Hermann*, 150 Ill. App. 3d 224, 230 (1986); *Lyon & Healy v. Walldren*, 201 Ill. App. 609, 612 (1916); *State v. One Hundred Fifty-Two Thousand, Seven Hundred Sixty, & 00/100 Dollars ($152,760.00), in United States Currency*, 87 S.W.3d 374, 380 (Mo.

Ct. App. 2002)), and personal property located inside a person's residence is considered to be in the constructive possession of that person (*People v. Morrison*, 178 Ill. App. 3d 76, 90 (1988); *Bishop v. Ellsworth*, 91 Ill. App. 2d 386, 391 (1968)). Because Woodland controlled his residence at 227 North 25th Street along with everything inside it, he was in constructive possession of the $4,850 and therefore was presumably its owner. When the police took the $4,850, Woodland, the presumptive owner of the currency, suffered an "injury in fact to a legally cognizable interest." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). Hence, contrary to the State's argument, he has standing.

¶ 18                              C. The State's Request for a Default Judgment

¶ 19          Because Woodland filed no answer as required by section 9(E) of the Act (725 ILCS 150/9(E) (West 2008)) but instead filed a motion for dismissal, the State requests that we vacate the trial court's judgment and remand this case with directions to enter a default judgment in the State's favor and to declare the $4,850 to be forfeited. Actually, the State has forfeited its objection to the lack of an answer because the State never made that objection in the proceedings below. See *In re Marriage of DiAngelo*, 159 Ill. App. 3d 293, 300 (1987). We have reviewed the common-law record as well as the transcript of the June 22, 2010, hearing on Woodland's motion for dismissal, and it does not appear that the State ever mentioned the lack of an answer. A nonjurisdictional argument made for the first time on appeal is considered to be forfeited. *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 301 (2006); *People v. Amerman*, 50 Ill. 2d 196, 197 (1971).

¶ 20                         D. Is the Cumulative 97-Day Deadline in Sections 5 and 6(A)
                                          of the Act Mandatory or Directory?

¶ 21          The Act imposes deadlines on the police and the State's Attorney after the police seize property. Within 52 days after seizing the property, the police must notify the State's Attorney of the seizure. 725 ILCS 150/5 (West 2006). If the property is worth $20,000 or less, the State's Attorney must cause a notice of pending forfeiture to be given to the owner within 45 days after the State's Attorney receives notice from the police. 725 ILCS 150/6(A) (West 2006). The owner then has 45 days after receiving notice from the State's Attorney to file a verified claim and a cost bond (or an indigency affidavit) with the State's Attorney's office. 725 ILCS 150/6(C)(1) (West 2006). Then, within 45 days after receiving the claim and the cost bond, the State's Attorney must institute judicial *in rem* forfeiture proceedings by filing a verified complaint in circuit court. 725 ILCS 150/6(C)(2) (West 2006). So, unless these time periods are stayed while the property is retained for evidence (725 ILCS 150/10 (West 2006)), the Act contemplates that no later than 187 days after the seizure of property worth $20,000 or less, the State's Attorney shall file a complaint seeking a judgment that the owner has forfeited the property, assuming that the owner has filed a timely claim ($52 + 45 + 45 + 45 = 187$).

¶ 22          In his brief, Woodland observes that the State violated section 6(C)(2) of the Act by failing to file a verified complaint within 45 days after receiving his verified claim and his indigency affidavit. See 725 ILCS 150/6(C)(2) (West 2006). He filed his claim and his

indigency affidavit on October 11, 2007, and it was not until 888 days later, on March 16, 2010, that the State filed its verified complaint. In its reply brief, however, the State argues that Woodland has forfeited the 45-day statute of limitations in section 6(C)(2) because he did not cite section 6(C)(2) in trial court but cited only sections 5 and 6(A). The State is correct. It long has been a rule of the common law that statutes of limitations must be specially pleaded or else they are forfeited (*Gebhart v. Adams*, 23 Ill. 397, 399 (1860)), and presumably that rule applies to proceedings under the Act. Given that Woodland has procedurally forfeited his contention that the State exceeded the deadline in section 6(C)(2), we are left with the contention that the State exceeded, by 37 days, the cumulative 97-day deadline in sections 5 and 6(A) (134 - 97 = 37).

¶ 23　The question in this appeal is whether that delay defeats the State's forfeiture action. In other words, is the cumulative 97-day deadline in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2006)) mandatory or directory?

¶ 24　A mandatory provision and a directory provision are both couched in obligatory language, but they differ in that noncompliance with a mandatory provision vitiates the governmental action, whereas noncompliance with a directory provision has no such effect. As the supreme court has explained, " 'the "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' " *People v. Robinson*, 217 Ill. 2d 43, 51-52 (2005) (quoting *Morris v. County of Marin*, 559 P.2d 606, 610-11 (Cal. 1977)).

¶ 25　Whether a statutory provision is mandatory or directory is a matter of statutory construction. Our goal is to determine, *de novo*, what the legislature intended. *Robinson*, 217 Ill. 2d at 54. From the use of the command verb "shall" in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2006)), we can rule out that the legislature intended the deadlines in those sections to be optional. "Shall" means "shall," and the legislature intended those deadlines to be met. See *Robinson*, 217 Ill. 2d at 50-51. That conclusion, however, does not resolve the question of consequences. Just because the legislature intended the deadlines to be met, it does not necessarily follow that the legislature intended that a missed deadline would bar a forfeiture. See *Robinson*, 217 Ill. 2d at 54 ("[W]henever *** the mandatory-directory dichotomy is at issue the word 'shall' is not determinative."). In the Act, the legislature does not specify any consequence if the police disobey the procedural command to send a notice of seizure to the State's Attorney within 52 days after the seizure (725 ILCS 150/5 (West 2006)) or if the State's Attorney disobeys the procedural command to send a notice of pending forfeiture to the owner within 45 days after receiving notice of seizure from the police (725 ILCS 150/6(A) (West 2006)).

¶ 26　We begin with the presumption that a procedural command to a governmental official is directory. The supreme court has said: "With respect to the mandatory/directory dichotomy, we presume that language issuing a procedural command to a government official indicates an intent that the statute is directory." *People v. Delvillar*, 235 Ill. 2d 507, 517 (2009). This presumption, however, like all presumptions, can be rebutted. "This presumption is overcome under either of two conditions. A provision is mandatory under this

dichotomy when there is negative language prohibiting further action in the case of noncompliance or when the right the provision is designed to protect would generally be injured under a directory reading." *Id.*

¶ 27    Woodland argues that the second condition is fulfilled in this case. He argues that giving a directory meaning to the deadlines in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2006)) generally would injure the right those deadlines were designed to protect, namely, "an individual's fundamental right to his own property." In support of that argument, Woodland cites some decisions from other states, including *State v. 1978 LTD II*, 701 P.2d 1365 (Mont. 1985), and *State v. Rosen*, 240 N.W.2d 168 (Wis. 1976). In both of those cases, a deadline in a civil forfeiture statute was missed, giving the courts occasion to reflect on the purpose behind the deadlines. The Supreme Court of Montana observed that the forfeiture statute was "an exception to the general rule that property [might] not be seized without a prior factfinding hearing." *1978 LTD II*, 701 P.2d at 1367. The Montana court agreed with *Rosen* that "because such seizures [were] ex parte, the statutory safeguards should be rigidly adhered to." *Id.* The purpose of the statutory deadlines was " 'to provide a prompt adjudication of the issues involved in the forfeiture proceeding' " and to " 'seek to mitigate the harsh effects of the seizure and forfeiture proceeding.' " *Id.* (quoting *Rosen*, 240 N.W.2d at 172).

¶ 28    Thus, by the reasoning of the supreme courts of Montana and Wisconsin, the purpose of putting deadlines in forfeiture statutes is to mitigate the harsh effects of seizing property without a prior hearing. The mitigation occurs, of course, by giving the property owner a reasonably prompt opportunity for a postdeprivation hearing preceded by a meaningful notice. This is the right that the deadlines seek to protect: the right to timely postdeprivation procedures so as to lessen the harshness of seizing a person's property before giving that person an opportunity for a hearing.

¶ 29    Again, if disregarding such deadlines "generally" would injure the right the deadlines were designed to protect, the deadlines are mandatory. *Delvillar*, 235 Ill. 2d at 517; *Robinson*, 217 Ill. 2d at 58. Not all procedures exist to protect rights. Procedures also can serve the interest of governmental efficiency. The United States Supreme Court has explained:

"There are undoubtedly many statutory requisitions [(requirements)] intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated. But when the requisitions prescribed are intended for the protection of the citizen, and to prevent a sacrifice of his property, and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory. They must be followed or the acts done will be invalid. The power of the officer in all such cases is limited by the manner and conditions prescribed for its exercise." *French v. Edwards*, 80 U.S. 506, 511 (1871), quoted in *People v.*

*Jennings*, 3 Ill. 2d 125, 127 (1954).

¶ 30    In other words, some statutory procedures have the sole purpose of promoting order and efficiency in governmental operations, and disregarding these procedures generally will not injure anyone's rights but merely will make government less orderly and less efficient. Unless the statute says otherwise, noncompliance with these order-enhancing procedures will not invalidate the governmental action to which they relate. "[P]articular [statutory] provisions may be regarded as *directory* merely; by which is meant that they are to be considered as giving directions which *ought* to be followed, but not as so limiting the power in respect to which the directions are given that it cannot be effectually exercised without observing them." (Emphases in original.) Thomas M. Cooley, Constitutional Limitations 74 (1868), cited in *French*, 80 U.S. at 511 n.9. Directory procedures are directions that governmental officials ought to follow if they are doing their job properly, but such procedures are not conditions on the exercise of their power. Mandatory procedures, by contrast, limit power. Noncompliance with mandatory procedures invalidates the governmental action to which they relate because mandatory procedures are designed to protect people's rights, such as the right to property.

¶ 31    This is not to say that mandatory procedures are indifferent to order and efficiency. Violating someone's rights could be considered a disorderly way to transact governmental business. Orderliness and individual rights are not mutually exclusive values. Mandatory procedures can promote both values. While one of the values–governmental efficiency–is inessential to the validity of the governmental action, the law will not tolerate a sacrifice of the other value, the rights of citizens. Therefore, the power of the governmental official is conditional on compliance with the mandatory procedure.

¶ 32    To determine whether a procedure is mandatory and therefore a limitation on power, we have to ascertain, by a process of inference, whether the purposes of the procedure include the protection of rights. "[T]his question [is] to be decided by ascertaining whether any advantage would be lost, or right destroyed, or benefit sacrificed, either to the public or to any individual, by holding the provision directory." Thomas M. Cooley, Treatise on Constitutional Limitations 76 (1868), cited in *French*, 80 U.S. at 511 n.9. The State disputes that holding the deadlines in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2006)) to be directory would generally have an injurious effect on rights. The State admits that "[c]ertainly, cumulative tardiness beyond the maximum, 97 days' obligation, would delay the State's initiating proceedings against the seized property, would delay the State's notifying owners and interest holders, and would likely delay the filing of a claim under section 6(C) of the Forfeiture Act." The State also admits that these delays could in turn "delay return of the property." Nevertheless, the State points out that "[s]uch a delay *** would not, in and by itself, divest an owner or interest holder of his or her rights in the property." The owner still could file a claim and a cost bond within 30 days after the State's Attorney declares a forfeiture (725 ILCS 150/14 (West 2008)), and, the State further points out, the period of limitation for "[a] civil action under this Act" is five years. 725 ILCS 150/9(L) (West 2008).

¶ 33    Besides, the State argues, Woodland suffered no prejudice from the 37-day delay in sending him the notice of pending forfeiture. He filed his verified claim and his indigency

-8-

affidavit on time. The State suggests it is highly unlikely that any claimant would lose his or her right to file a claim if the police and State's Attorney disregarded the deadlines in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2008))–just as in *Robinson*, 217 Ill. 2d at 57, the supreme court concluded it was unlikely that a petitioner's right to appeal the dismissal of a postconviction petition would be prejudiced by the circuit clerk's violation of section 122–2.1(a)(2) of the Post-Conviction Hearing Act (725 ILCS 5/122–2.1(a)(2) (West 2000)), which required the clerk to serve the dismissal order upon the petitioner within 10 days after its entry.

¶ 34    In *Robinson*, however, the right at issue was the right to file an appeal, whereas in the present case, the right at issue is not simply the right to file a claim but also the right to reasonably prompt postdeprivation procedures. Looking at the difference from another angle, the postconviction petitioner in *Robinson* and the owner of the seized property are not truly comparable. It was only after a hearing that the postconviction petitioner in *Robinson* incurred a penalty, whereas the owner of the seized property has incurred a penalty, *i.e.*, dispossession of property, before being afforded the opportunity for a hearing. The dispossession is itself a financial harm because the use of property has value; being deprived of it, even temporarily, causes hardship. Consequently, the owner of the property is entitled to expect reasonably prompt postdeprivation procedures: the opportunity for a hearing at a meaningful time (*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547 (1985)), preceded by a meaningful notice (*Kosakowski v. Board of Trustees of the City of Calumet City Police Pension Fund*, 389 Ill. App. 3d 381, 387 (2009)). See also *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972) (except in extraordinary circumstances in which a valid governmental interest justifies postponing the hearing until after the seizure, an opportunity for a hearing must be provided before the seizure of property); *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (both the fourth and fifth amendments require notice and an opportunity for a hearing before the seizure of real, as opposed to personal, property); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679-80 (1974) (the government did not have to provide notice and an opportunity for a hearing before seizing a yacht that was subject to civil forfeiture, because the extraordinary circumstances mentioned in *Fuentes* existed); *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555, 564 (1983) (whether the delay in providing an opportunity for a postdeprivation hearing is so unreasonable as to violate due process depends on a weighing of four factors: the length of the delay, the reason for the delay, the claimant's assertion of his or her right, and prejudice to the claimant). The cumulative 97-day deadline in sections 5 and 6(A) (725 ILCS 150/5, 6(A) (West 2006)) represents the legislative judgment of what is the *maximum* length of time, consistent with reasonableness, that the State may allow to pass between the seizure and the giving of a notice of pending forfeiture to the property owner. See *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 274 (2004). By corollary, in the legislative judgment, exceeding those 97 days is unreasonable and injurious.

¶ 35    In summary, we conclude that the cumulative 97-day deadline in sections 5 and 6(A) of the Act (725 ILCS 150/5, 6(A) (West 2006)) has the purpose not only of promoting efficiency and dispatch in governmental operations but also of protecting the property

owner's right to reasonably prompt postdeprivation procedures. We further conclude that making the deadline directory would tend to injure that right. See Theodore Sedgwick, Treatise of the Rules Which Govern the Interpretation & Application of Statutory and Constitutional Law 375 (1857) ("the recognition of the doctrine that explicit provisions of statutes can be disregarded with entire impunity as to the result of the particular proceeding, is likely to lead to unbounded negligence and indifference on the part of public officers"), cited in *French*, 80 U.S. at 511. Therefore, the cumulative 97-day deadline in sections 5 and 6(A) of the Act is a mandatory procedure, the disregard of which vitiates the contemplated forfeiture.

¶ 36                E. The Asserted Preemptive Effect of Section 9(A)

¶ 37      The State argues that on its face, the timing provision in section 9(A) (725 ILCS 150/9(A) (West 2006)) "preempts" the timing provision in section 6(A) (725 ILCS 150/6(A) (West 2006)). Section 9(A) does not say, though, that it preempts section 6(A), and the two different procedures in sections 9(A) and 6(A) can coexist. Section 6(A) discusses when the State's Attorney "shall cause notice of pending forfeiture to be given": "within 45 days of the receipt of notice of seizure from the seizing agency." 725 ILCS 150/6(A) (West 2006). Section 9(A), by contrast, discusses when the State's Attorney "shall institute judicial forfeiture proceedings by filing a verified complaint": "within 45 days of the receipt of notice of seizure by seizing agency or the filing of the claim and cost bond, whichever is later." 725 ILCS 150/9(A) (West 2006).

¶ 38      Section 9(A) envisions the possibility that the owner might file a claim and a cost bond early, before the expiration of the 52-day period that the police are allowed for sending a notice of seizure to the State's Attorney (see 725 ILCS 150/5 (West 2006)) and before the expiration of the ensuing 45-day period that the State's Attorney is allowed for sending a notice of pending forfeiture to the owner (see 725 ILCS 150/6(A) (West 2006)). In that event–if the owner files a claim early–section 9(A) ensures that governmental officials still have adequate time to review the facts and to make a conscientious decision: the police still have their 52 days to send a notice of seizure to the State's Attorney (a notice which, among other things, estimates the value of the property and describes the circumstances in which it was seized (725 ILCS 150/5 (West 2006))), and the State's Attorney still has 45 days after receiving the notice from the police to file a verified complaint (as well as give a notice of pending forfeiture to the owner pursuant to section 6(A)).

¶ 39      Woodland, however, did not file his claim early; he filed it after receiving the notice of pending forfeiture from the State's Attorney. Hence, the latest of the events in section 9(A) is the filing of the claim, and the normal order of procedures, with the associated deadlines, is intact, *i.e.*, a notice of seizure from the police, followed by a notice of pending forfeiture from the State's Attorney, followed by a claim, followed by a complaint. We are unconvinced that the legislature would prescribe deadlines in sections 5 and 6(A) only to nullify them in section 9(A). See *Lemont-Bromberek Combined School District No. 113(a) v. Walter*, 279 Ill. App. 3d 847, 850 (1996) ("Courts construe statutes to give effect to each section [citation], presuming that the legislature did not intend absurd, unjust or unreasonable

consequences [citation].").

¶ 40                F. The Asserted Preemptive Effect of Section 9(L)

¶ 41        The State contends that "[i]n concert with section 9(A), section 9(L) preempts the timing provisions not only of section 6(A) but also of section 5." Section 9(L) is a five-year statute of limitations, and it provides as follows: "A civil action under this Act must be commenced within 5 years after the last conduct giving rise to forfeiture became known or should have become known or 5 years after the forfeitable property is discovered, whichever is later, excluding any time during which either the property or claimant is out of the State or in confinement or during which criminal proceedings relating to the same conduct are in progress." 725 ILCS 150/9(L) (West 2006). Because it would be nonsensical to speak of property owners knowing of their own conduct or discovering their own property, "[a] civil action," in section 9(L), must refer exclusively to a forfeiture action by the State (not an action by the property owner). Under section 9(L), the State must file a verified complaint for forfeiture by the latest of two dates: (1) five years after the last conduct giving rise to forfeiture became known or should have become known or (2) five years after the forfeitable property was discovered.

¶ 42        Considering that section 9(L) discusses the deadline for filing a verified complaint for forfeiture, the State's argument that section 9(L) overrides sections 5 and 6(A) is a little difficult to follow. Sections 5 and 6(A) impose deadlines for other procedures, procedures other than the filing of the complaint. By giving the State's Attorney five years to file a complaint, section 9(L) does not logically excuse the police from sending a notice of seizure to the State's Attorney within 52 days after the seizure (see 725 ILCS 150/5 (West 2006)) or the State's Attorney from sending a notice of pending forfeiture to the property owner within 45 days after receiving the notice from the police (see 725 ILCS 150/6(A) (West 2006)).

¶ 43        Admittedly, at first glance, section 9(L) might appear to conflict with section 6(C)(2) (725 ILCS 150/6(C)(2) (West 2006)), which requires the State's Attorney to "institute judicial in rem forfeiture proceedings" within 45 days after receiving the verified claim and the cost bond (or indigency affidavit) from the owner of the seized property. If the owner files a verified claim and a cost bond, the State's Attorney probably could not wait five years after the latest of the triggering events in section 9(L) to file a verified complaint without missing the 45-day deadline in section 6(C)(2). Nevertheless, sections 9(L) and 6(C)(2) can be interpreted in such a way that they do not conflict. When statutory provisions relate to the same subject, they "must be compared and construed with reference to each other so that effect may be given to all of the provisions to the extent possible, even where an apparent conflict exists." *Flynn v. Industrial Comm'n*, 211 Ill. 2d 546, 555 (2004). If we construe sections 9(L) and 6(C)(2) together, section 9(L) does not nullify section 6(C)(2) but, rather, section 9(L) is subject to section 6(C)(2).

¶ 44        Here is how section 9(L) and the preceding sections of the Act can operate in tandem. *If the State does not seize the property*, section 9(L) (725 ILCS 150/9(L) (West 2006)) gives the State's Attorney five years after the latest of two dates to file a verified complaint for

forfeiture: (1) five years after the last conduct giving rise to forfeiture became known or should have become known or (2) five years after the forfeitable property was discovered. *If the State seizes the property*, however, the deadlines in sections 5, 6(A), 6(C)(2), and 9(L) all become applicable. The five-year period in section 9(L) remains the outer limit beyond which a forfeiture proceeding is barred, and scrupulously observing the deadlines in sections 5 and 6 will not save the forfeiture action from being time-barred if the complaint is filed beyond the five-year limit in section 9(L). On the other hand, keeping the deadline in section 9(L) but violating the deadlines in sections 5 and 6 will not save the forfeiture action from being time-barred, either. As a practical matter, this construction is necessary because interpreting section 9(L) so as to allow the State to seize property and to take no further action for years on end would almost certainly put section 9(L) at odds with the constitutional right against deprivation of property without due process of law. See U.S. Const., amend. V; Ill. Const. 1970, art. I, § 2; *$8,850*, 461 U.S. at 564.

¶ 45     Because of this constitutional necessity of affording reasonably prompt postdeprivation procedures after the seizure of property, one of the cases that the State cites in its brief, *Good*, is distinguishable, even though the Supreme Court in that case held that a five-year statute of limitations prevailed over internal timing requirements (*Good*, 510 U.S. at 65). The significant difference between *Good* and the present case is that in *Good*, the government had not seized the claimant's property (his house) before filing its *in rem* action.

¶ 46     In *Good*, 510 U.S. at 46, the Hawaiian police executed a warrant to search the claimant's house, and they found marijuana and drug paraphernalia inside. Six months later, the claimant pleaded guilty to a drug offense in state court, and he was sentenced to one year in jail, five years of probation, and a fine. He also forfeited some cash the police had found on the premises. *Id*. About 4 1/2 years after the Hawaiian police discovered the marijuana in the house, the federal government filed an *in rem* action in district court, seeking a forfeiture of the house and the four-acre parcel on which it stood. *Id*. The district court issued a "warrant of arrest *in rem*," whereupon the federal government seized the real estate. *Good*, 510 U.S. at 47.

¶ 47     One of the arguments that the claimant made on appeal was that the government's forfeiture action was time-barred because the government had failed to comply with the internal timing requirements in sections 1602 through 1604 of title 19 of the United States Code (19 U.S.C. §§ 1602 through 1604 (1988)). *Good*, 510 U.S. at 63. Section 881(d) of the federal forfeiture statute (21 U.S.C. § 881(d) (1988)) incorporated " 'provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs law' " (*Good*, 510 U.S. at 63 (quoting 21 U.S.C. § 881(d) (1988))), and the customs laws in turn contained a five-year statute of limitations (19 U.S.C. § 1621 (1988)) as well as a series of internal timing requirements (19 U.S.C. §§ 1602 through 1604 (1988)). *Good*, 510 U.S. at 63.

¶ 48     The statute of limitations in section 1621 began running from the time the drug offense was discovered. Section 1621 provided: " 'No suit or action to recover any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered.' " *Good*, 510 U.S. at 63 (quoting 19 U.S.C. § 1621 (1988)). Under section 1621,

the government's *in rem* forfeiture action was timely, because the government filed the action 4 1/2 years after the police discovered the marijuana. See *Good*, 510 U.S. at 46.

¶ 49   Under the internal timing requirements, however–under sections 1602 through 1604 (19 U.S.C. §§ 1602 through 1604 (1988))–the government's action was not timely, because those sections required governmental officers to act "immediately," "promptly," and "forthwith." Section 1602 required that a customs agent " 'report immediately' " to a customs officer every seizure for violation of the customs laws and every violation of the customs laws. *Good*, 510 U.S. at 63 (quoting 19 U.S.C. § 1602 (1988)). Section 1603 required that the customs officer " 'report promptly' " such seizures or violations to the United States attorney. *Good*, 510 U.S. at 63 (quoting 19 U.S.C. § 1603 (1988)). And section 1604 required the Attorney General " 'forthwith to cause the proper proceedings to be commenced' " if it seemed probable that any fine, penalty, or forfeiture had been incurred. *Good*, 510 U.S. at 63 (quoting 19 U.S.C. § 1604 (1988)). There appeared to be no dispute that waiting 4 1/2 years after the discovery of the marijuana to file the forfeiture action failed to conform to the adverbs "immediately," "promptly," and "forthwith."

¶ 50   Nevertheless, citing *French* among other authorities, the Supreme Court held that the internal timing requirements in sections 1602 through 1604 were directory instead of mandatory. *Good*, 510 U.S. at 63. The intent behind sections 1602 through 1604 was not to protect the property owner but, rather, to ensure that the government was prompt in obtaining revenue from property that was subject to forfeiture. *Good*, 510 U.S. at 65. Section 1621, the five-year statute of limitations, was the provision designed for the protection of property owners. The Supreme Court said: "Because § 1621 contains a statute of limitations–the usual legal protection against stale claims–we doubt Congress intended to require dismissal of a forfeiture action for noncompliance with the internal timing requirements of §§ 1602-1604." *Good*, 510 U.S. at 65.

¶ 51   In interpreting sections 1602 through 1604 (19 U.S.C. §§ 1601 through 1604 (1988)) as directory and section 1621 (19 U.S.C. § 1621 (1988)) as mandatory, the Supreme Court interpreted title 21, section 881 (21 U.S.C. § 881 (1988)), which, in subsection (d) (21 U.S.C. § 881(d) (1988)), incorporated those sections. *Good*, 510 U.S. at 63. We are supposed to interpret the Illinois statute in conformity with federal courts' interpretation of section 881. Section 2 of the Act says in part:

"The General Assembly further finds that the federal narcotics civil forfeiture statute upon which this Act is based has been very successful in deterring the use and distribution of controlled substances within this State and throughout the country. It is therefore the intent of the General Assembly that the forfeiture provisions of this Act be construed in light of the federal forfeiture provisions contained in 21 U.S.C. 881 as interpreted by the federal courts, except to the extent that the provisions of this Act expressly differ therefrom." 725 ILCS 150/2 (West 2006).

¶ 52   The operative phrase here is "except to the extent that the provisions of this Act expressly differ therefrom." It is true that sections 1602 and 1603(b) (19 U.S.C. §§ 1602, 1603(b) (2006)) are analogous to section 5 of the Act (725 ILCS 150/5 (West 2006)) in that they require law-enforcement officials to communicate expeditiously with the prosecutor, and it

is true that section 1604 (19 U.S.C. § 1604 (2006)) is analogous to sections 6(C)(2) and 9(A) of the Act (725 ILCS 150/6(C)(2), 9(A) (West 2006)) in that it requires the prosecutor to expeditiously bring suit. Sections 1602 through 1604 are different, however, from sections 5, 6(C)(2), and 9(A) in that in sections 1602 through 1604, a seizure of property is not the only event that obliges the governmental officials to act expeditiously.

¶ 53      For example, section 1602 provides:

"It shall be the duty of any officer, agent, or other person authorized by law to make seizures of merchandise or baggage subject to seizure for violation of the customs laws, to report every such seizure immediately to the appropriate customs officer for the district in which such violation occurred, and to turn over and deliver to such customs officer any vessel, vehicle, aircraft, merchandise, or baggage seized by him, and to report immediately to such customs officer every violation of the customs laws." 19 U.S.C. § 1602 (2006).

So, seizure or no seizure, section 1602 aims to ensure that information travels promptly from the law-enforcement officer to the customs officer for the district. The law-enforcement officer immediately must report to the customs officer not only "every seizure" but also "every violation."

¶ 54      Section 1603(b) in turn obliges the customs officer to communicate promptly with the prosecutor. (And for purposes of the incorporation of sections 1602 and 1603(b) into section 881 of title 21 (21 U.S.C. § 881 (2006)), one should substitute, for the term "custom officer," the phrase "such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General" (21 U.S.C. § 881(d) (2006)).) Section 1603(b) provides:

"Whenever a seizure of merchandise for violation of the customs laws is made, or a violation of the customs laws is discovered, and legal proceedings by the United States attorney in connection with such seizure or discovery are required, it shall be the duty of the appropriate customs officer to report promptly such seizure or violation to the United States attorney for the district in which such violation has occurred, or in which such seizure was made, and to include in such report a statement of all the facts and circumstances of the case within his knowledge, with the names of the witnesses and a citation to the statute or statutes believed to have been violated, and on which reliance may be had for forfeiture or conviction." 19 U.S.C. § 1603(b) (2006).

Again, section 1603(b) requires the prompt reporting not only of "seizures" but also of "violations."

¶ 55      Now compare section 5 of the Act, which provides as follows:

"The law enforcement agency seizing property for forfeiture *** shall, within 52 days of seizure, notify the State's Attorney for the county in which an act or omission giving rise to the forfeiture occurred or in which the property was seized of the seizure of the property and the facts and circumstances giving rise to the seizure and shall provide the State's Attorney with the inventory of the property and its estimated value. When the property seized for forfeiture is a vehicle, the law enforcement agency seizing the property shall immediately notify the Secretary of State that forfeiture proceedings are pending regarding such vehicle." 725 ILCS 150/5 (West 2006).

¶ 56    The significant difference between sections 1602 and 1603(b), on the one hand, and section 5, on the other hand, is that sections 1602 and 1603(b) each have two different triggers of the officer's duty to promptly pass along information: a "seizure" and a "violation." Thus, if the officer seizes property, the officer must promptly report. Also, if the officer becomes aware of a violation but seizes no property (the situation in *Good*), the officer must promptly report. Section 5, by contrast, has only one trigger: a "seizure"–and this seizure ultimately leads to the issuance of the notice of pending forfeiture in section 6(A). It follows, as the Supreme Court held in *Good*, that sections 1602 through 1604 can be directory, namely, when the police and prosecutor are aware of someone's drug violation but the government possesses none of that person's property. In that circumstance, moving the investigation along can serve only the economic interest of the government. Because sections 5 and 6(A), though, are triggered only by a seizure (more precisely, section 6(A) is triggered by the receipt of a notice of seizure, which in turn was triggered by a seizure), the cumulative 97-day deadline that they create necessarily has, as one of its purposes, the protection of the owner. Hence, that deadline is mandatory.

¶ 57                                    III. CONCLUSION

¶ 58    For the foregoing reasons, we affirm the trial court's judgment.

¶ 59    Affirmed.